CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 10 2015

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROBERT L. MARMON, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 7:13-CV-00074 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| R. A. LILLY & SONS, INC., | ) By: Hon. Glen E. Conrad |
| | ) Chief United States District Judge |
| Defendant. | ) |

Plaintiff Robert L. Marmon filed this action against his former employer, Defendant R.A. Lilly & Sons, Inc. ("Lilly & Sons"), claiming that he was sexually harassed in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Marmon also asserts a claim for constructive discharge. The case is presently before the court on Lilly & Sons' motion for summary judgment. For the following reasons, the court will grant that motion.

**Factual and Procedural History**

The following facts from the summary judgment record are either undisputed, or, where disputed, are presented in the light most favorable to Marmon. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (all evidence must be construed in the light most favorable to the party opposing summary judgment).

Lilly & Sons, d/b/a Five Star Fab & Fixture ("Five Star"), is a family-owned company that manufactures countertop products and commercial cabinetry for medical entities, universities, home centers, cabinet shops, and building supply companies. Deposition of Roger Lilly ("Roger Dep.") at 5-7, Mot. Summ. J. Ex. 4, Docket No. 44. The president and sole shareholder of Lilly & Sons is Roger Lilly ("Roger"[1]). Roger's three sons – Jeremy, Justin, and Jared – also work at Five Star. Id. Jeremy is the IT Manager, and Justin is the Human Resources Manager. Id. Jared worked in several

---

[1] Because this case involves several members of the Lilly family, the court refers to each by his first name.

positions at Five Star during the relevant time period, including as a cabinet fabricator, a solid surface fabricator, a solid surface installer, and a supervisor in the solid surfaces department. Deposition of Jared Lilly ("Jared Dep.") at 14, 20-22, 30-31, Mot. Summ. J. Ex. 10. Other Lilly family members also work at Five Star. Deposition of Bryan Wilkinson ("Wilkinson Dep.") at 18, Pl.'s Br. in Opp. Ex. 3, Docket No. 51. According to Marmon, "if one of [Roger's] sons told [an employee] to do something, it was the equivalent of Roger telling [the employee] to do it." Marmon Decl. ¶ 5, Pl.'s Br. in Opp. Ex. 4.

Marmon began working for Five Star in 2002. Deposition of Robert Marmon ("Marmon Dep") at 27. After he was hired, Marmon participated in a brief orientation. Id. at 30-31. He also received an employee handbook outlining Five Star's policies and procedures, including its equal opportunity employment policy and anti-harassment policy. Id. at 38-39, Mot. Summ. J. Ex. 1. Marmon knew to whom he could report complaints under the harassment policy and understood that complaints should be reported immediately. Id. at 39-40. Although Five Star updated its employee handbook from time to time, Marmon testified that he did not receive those updates. Id. at 37.

Soon after Marmon was hired, he went on an installation job with Jared. Id. at 119-20. At that time, Marmon told Jared that he had served in the Navy, to which Jared replied, "Well, you know how those Navy boys are." Id. at 120. Marmon also told Jared that his brother was homosexual, and Jared said that "it runs in the family." Id. Within "a week or two" of this interaction, Jared began to frequently refer to Marmon as "bob on my knob," a phrase suggesting oral sex.[2] Id. at 48-49; Jared Dep. at 35-36. Jared occasionally made gestures imitating oral sex or grabbed his testicles when he said this phrase. Marmon Dep. at 99, 105. According to Marmon, Jared started making these comments because "he thought that it was funny...that [Marmon] had a

2

gay brother." Id. at 120. Jared called Marmon this name "all the time, every day, every other day for years." Id. at 99. Approximately a dozen times, Jared also sang a song to Marmon that included the lyrics "bob on my knob." Id. at 104; Jared Dep. at 33-35, 47-48, 57. Jared also posted the lyrics to this song on Marmon's machine at work. Marmon Dep. 107-108; Jared Dep. 35, 47-48, 58. Over time, other Five Star employees, including Shannon Charles and Jay Sheldon, began to call Marmon this name occasionally as well.[3] Id. at 97, 131-32.

Marmon generally ignored Jared and the other employees. See Marmon Dep. at 122 ("I'm a big enough boy, I can take that kind of stuff... That's how my ma raised me, you know, just ignore them. They'll get tired of saying it."). Marmon also attempted to avoid Jared by using different restrooms so as to not cross paths with him. Id. at 105. One time in 2009 or 2010, Marmon told Jared that he needed to "watch his mouth." Id. at 98. Marmon likewise told Shannon Charles on one occasion to "watch [his] mouth" because Marmon was "tired of hearing that." Id. at 133. Marmon did not tell Jared or Charles that he was offended by this behavior or ask either man to stop. Id. at 109. Marmon left the note Jared posted hanging on his machine for four to six months, which Marmon admits could be interpreted as a sign that he was not offended by the song's lyrics. Id. at 109-10. Jared testified that he believed that he had a "teasing" relationship with Marmon. Jared Dep. at 34, 43.

In 2003 or 2004, Marmon was discussing a job with Jared when Jared "backhanded [him] in [his] privates, in [his] penis." Marmon Dep. at 121-22. Jared testified that he occasionally participated in this kind of "horseplay game," known as "bag tag," with his friends and coworkers. Jared Dep. at 49-50; see also R. Garcia Dep. at 13-16, Mot. Summ. J. Ex. 9; Huffman

---

[2] Lilly & Sons suggests that this phrase referenced a local radio jingle that included the line, "Turn your knob to Bob FM." Jared admits, however, that he knew the phrase had sexual connotations. See Jared Dep. at 37-38.
[3] Marmon was not the only Five Star employee subjected to Jared's crude behavior. Once, Jared told Marmon and another Five Star employee that his favorite names were "Neal and Bob," in reference to a sexual act. Marmon Dep. at 50. On another occasion, Jared positioned himself behind a man bent over a saw, mimicking a sexual act. Id. at 156.

3

Dep. at 14-17, Mot. Summ. J. Ex. 7; Mitchell Dep. at 8-10, Mot. Summ. J. Ex. 5 (confirming that some Five Star employees, including Jared, played this "game" from time to time). Marmon immediately tried "to put a boot in [Jared's] butt as he ran away" and told Jared that if he did that again, "they will carry [him] out of here in an ambulance," because Marmon would not "put up with that stuff." Marmon Dep. at 121-22; Jared Dep. at 49-50. Jared never attempted to touch Marmon's groin again. Marmon Dep. 121-23.

On November 14, 2010, Marmon went to work on a Sunday to polish a display case. Id. at 91. He approached Roger, Justin, and Jared, who were standing together on the shop floor, to tell them he had completed the task. Id. at 91-92. Roger and Justin thanked him for coming into work on the weekend. Id. at 92. As Marmon walked away, however, Jared "broke into his song" in front of his father and brother. Id. Marmon "looked back at them and… [Roger and Justin] gave no indication that anything was happening." Id. Marmon "shook [his] head and walked off." Id. According to Marmon, Roger and Justin clearly heard Jared singing the offensive song that day and did nothing to stop him. Id. at 92-93.

In late 2009 or early 2010, Five Star implemented a new time- and cost-saving method for cutting countertops. Id. at 55-59. Marmon struggled with this new procedure. Id. at 61. On November 3, 2010, after a series of verbal warnings, Brian Wilkinson, Five Star's Operations Manager, issued Marmon a written reprimand for failing to follow the new procedure. Id. at 61-69. On November 19, 2010, Wilkinson issued Marmon a second written reprimand after he fabricated the materials for a project in the wrong color laminate. Id. at 74-77. During this disciplinary meeting, Marmon told Wilkinson about Jared's song for the first time. Id. at 111-13; Wilkinson Dep. at 21, 25-26. Wilkinson responded by describing Marmon's complaints as "just venting." Marmon Dep. at 112. Marmon replied, "Yeah, that's pretty much how it goes here." Id. Marmon also told Wilkinson, "Just don't worry about it" because "we don't want to upset the

4

Lillys." Id. Marmon testified that he "didn't expect [Wilkinson] to do nothing" about the harassment. Id. at 114. Wilkinson agreed not to report Marmon's complaint. Wilkinson Dep. at 21 ("[Marmon] had asked me to keep [his complaints] in confidence from the beginning..."). According to Wilkinson, he "did not know that... [Marmon] was talking about sexual harassment insofar as... a formal complaint." Id. at 25. Wilkinson had never handled a sexual harassment complaint before. Wilkinson Decl. ¶ 3, Mot. Summ. J. Ex. 8.

On December 20, 2010, Roger learned that Marmon told other Five Star employees that he intended to "take [Lilly & Sons] to court and [] settle [his complaints] that way." Marmon Dep. at 115; Roger Dep. at 8 ("Initially, [Marmon] had not lodged a complaint, but I heard that he was unhappy...from several employees on the production floor."). That same day, Roger directed Wilkinson and Ralph Mitchell, a Five Star project manager, to investigate Marmon's complaints. Roger Dep. at 9. Roger specifically did not ask his son Justin, Five Star's Human Resources Manager, to complete the investigation, because he "felt that since [Marmon's complaints] involved a family member, [the investigation] should be hands-off by family." Id. Wilkinson told Roger that Marmon had complained to him about Jared's behavior approximately one month earlier, but that he had not reported the complaint at Marmon's request. Id. at 10-11. Roger "told [] Wilkinson that that was not appropriate," and directed Wilkinson and Mitchell to begin their investigation as soon as possible. Id. at 11. Specifically, Roger told them "to talk to [] Marmon, find out what the problem [was], and then...investigate the whole matter." Id. at 9.

Wilkinson and Mitchell interviewed Marmon the following day. Wilkinson Dep. at 23-24. During that interview, Marmon identified several co-workers who he believed had witnessed Jared's harassment. Id. Wilkinson and Mitchell interviewed these Five Star employees approximately three weeks later. Id. This delay occurred, at least in part, because of Five Star's holiday schedule and the work schedules of various employee witnesses. Id. at 24; Marmon Dep.

5

at 125-26. These individuals confirmed at least some of Jared's behavior, although one of Marmon's coworkers stated that he did not think that Marmon found the behavior offensive. See Deposition of Jason Huffman ("Huffman Dep.") at 11-12; Metcalf Dep. at 7-8; R. Garcia Dep. at 9-10; D. Garcia Dep. at 10-11; Wilkinson Decl. ¶ 4. Wilkinson and Mitchell also interviewed Roger Lilly, who stated that he did not recall hearing Jared singing to Marmon in November, as Marmon had described. Finally, Wilkinson and Mitchell interviewed Jared, who admitted to calling Marmon "bob on my knob," singing a song with those lyrics, posting those lyrics on Marmon's machine, and attempting to "bag tag" Marmon on one occasion. Wilkinson Dep. at 37-38; Jared Dep. at 39-41. Jared testified that he did not know his actions offended Marmon until he had made a complaint. Jared Dep. at 46.

As a result of the investigation, Jared was issued a "reprimand pending suspension" on January 25, 2011. Wilkinson Dep. at 39; Jared Dep. at 39-41; Justin Dep. Ex. 16. In this reprimand, which was placed in his human resources file, Jared was warned that "any such further offensive remarks made toward [] Marmon or other employees will not be tolerated," and that any other "legitimate complaints will result in further disciplinary action up to and including termination." Justin Dep. Ex. 16. According to Mitchell, he and Wilkinson decided on this punishment for two reasons: first, Jared had no prior disciplinary record; and, second, Jared's behavior had occurred over a long period without any complaint from Marmon, making it difficult to discern "how upsetting" it had been. Mitchell Dep. at 22. Marmon testified that he believed this reprimand was only a "slap on the hand;" however, he admits that Jared never behaved inappropriately toward him again. Marmon Dep. at 129-30. According to Jared, he believed that he would have been fired if he behaved that way in the future. Jared Decl. ¶ 5.

Following the investigation, Wilkinson "checked in" with Marmon periodically to ensure he had no further complaints. Marmon Dep. at 124, 126-27. In February 2011, Marmon told

6

Wilkinson that Shannon Charles had sung "the song" to him. Id. at 131-35; Wilkinson Decl. ¶ 6. According to Marmon, after he made this report, Five Star management "hauled [Charles] up there finally and told him any more outbursts from his side would be...met severely with a reprimand." Marmon Dep. at 146. Marmon admits that Charles made no further comments to Marmon after this intervention. Id.

On January 13, 2011, Marmon received a third written reprimand after he failed to correctly laminate panels of material. Marmon Dep. at 78-80, Ex. 7. According to Marmon, his repeated mistakes at work occurred, at least in part, because of Jared's sexual harassment. Id. at 147-48 ("I was just upset thinking about it...I think a lot of my mistakes were due to the fact that it was coming to a head... I was just upset, wasn't thinking right, you know, losing sleep, talking about it with my wife..."). Marmon admits, however, that he was also concerned about work issues not related to his alleged harassment. Id. at 148 (citing pay cuts and lost contracts as reasons why he was not able to concentrate at work). A few weeks later, Marmon received a fourth written reprimand after he made threatening comments about members of the Lilly family to other Five Star employees. Id. at 85-86. Although the reprimand stated that "[s]uch conduct would normally subject an employee to immediate termination," Marmon received only a reprimand, given his "long employment history with the Company." Id. at Ex. 7.

In late February 2011, Marmon obtained new employment at Altec Industries ("Altec"), located in Daleville, Virginia.[4] Id. at 21, 88. Marmon "left [Five Star] on a Friday, [and] went to work for [Altec] on a Monday." Id. at 22. On March 7, 2011, Marmon called in sick to work at Five Star, rather than inform the company of his new position. According to Marmon, he decided not to inform Five Star that he had found new employment because he believed "they already knew [he] was gone." Id. at 88.

---

[4] Marmon earns $16.92 per hour at Altec; when he left Five Star, he earned $12.87 per hour. Id. at 22-23, 26.

7

Marmon filed a Charge of Discrimination with the Virginia Council on Human Rights and the Equal Opportunity Employment Commission ("EEOC") on September 8, 2011. Id. at 88-89. In this charge, Marmon claims that he was sexually harassed at Five Star from approximately 2009 until he "resigned in March 2011 as a result of [the] harassment." Id. at Ex. 9. The charge includes Marmon's allegations against Jared; however, it does not refer to Jared's backhanding of Marmon's groin, nor does it refer to harassment by any other Five Star employee. Id. According to Marmon, he waited six months to file the charge "just to keep them wondering." Id. at 90.

Marmon received a notice of right to sue from the EEOC on December 17, 2012, and filed his complaint on February 22, 2013. Compl. ¶ 3, Docket No. 1. Following the close of discovery, Lilly & Sons filed the present motion for summary judgment. That motion has been fully briefed, and was argued on February 3, 2015. The matter is now ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact to avoid summary judgment, a party's evidence must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Id. at 255; see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985). The court cannot "weigh[] the evidence or assess[] the witnesses' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). Nonetheless, the court must carry out its "affirmative obligation…to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

## Discussion

Marmon asserts two claims for relief: a Title VII claim based on an allegedly hostile work environment, as well as a claim for constructive discharge. Lilly & Sons argues that neither claim can withstand summary judgment. The court agrees, for the reasons discussed below.

### I. *Hostile Work Environment:*

Title VII prohibits employers with more than fifteen employees from discriminating against any employee "with respect to [his] compensation, terms, conditions, or privileges of employment" on the basis of his or her sex. See 42 U.S.C. §§ 2000e-2(a), 2000e(b). Because an employee's work environment is a term or condition of employment, this prohibition includes actions that create or perpetuate a hostile or abusive working environment. See Vance v. Ball State Univ., ___ U.S. ___, 133 S. Ct. 2434, 2440 (2013). A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). Title VII is not designed to "purge the workplace of vulgarity;" thus, "[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable." Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (citation and internal quotation marks omitted).

To survive summary judgment on his hostile work environment claim, Marmon must show that "the offending conduct (1) was unwelcome, (2) was based on [his] sex, (3) was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment, and (4) was imputable to [his] employer." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003). The court believes that Marmon has established a genuine issue of material fact as to whether the harassment he experienced was unwelcome, as well as whether the

9

harassment was severe or pervasive.[5] Nonetheless, the court concludes that Marmon's claim cannot withstand summary judgment, because he has failed to produce sufficient evidence from which a reasonable juror could impute Jared's harassment to Five Star.

"Under Title VII, an employer's liability…may depend on the status of the harasser." Vance, 133 S. Ct. at 2439. If the harasser is the victim's co-worker, the employer is liable "only if it was negligent in controlling working conditions." Id. On the other hand, if the harasser was the victim's supervisor, the employer can be held strictly liable if the harassment results in a tangible employment action. Id. In Vance, the Supreme Court defined a "supervisor" as one who "is empowered by the employer to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 2443 (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Here, Marmon contends that Jared was his supervisor, making Lilly & Sons vicariously liable for his harassment and constructive discharge. The court is constrained to disagree.

The record reflects that Jared worked as a supervisor in the solid surfaces department at Five Star during some portions of Marmon's employment. See Jared Dep. at 17-22, 30. Marmon never worked in that particular department, however. See Marmon Dep. at 42-46, 101 ("I didn't work with [Jared] on a daily basis for any length of time. I was here and he was over there in his department."). Marmon nonetheless asserts that Jared, as a member of the Lilly family, had the ability to control other employees. See Marmon Decl. ¶ 4 ("Roger told me and the other employees of Five Star that if one of his sons told us to do something, it was the equivalent of Roger telling us

---

[5] Whether the alleged harassment was "because of sex" presents a closer question. To prevail on this element, Marmon must "demonstrate that the harassing conduct was not merely 'tinged with offensive sexual connotations,' but actually constituted discrimination because of sex." English v. Pohanka of Chantilly, Inc., 190 F. Supp.2d 833, 840 (E.D. Va. 2002) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80)). The parties dispute whether Marmon has done so. Because the court concludes that Marmon has not produced sufficient evidence to impute Jared's behavior to Five Star, as discussed herein, the court declines to address this issue.

10

to do it."). Marmon also states that

> Jared certainly had enough power to influence whether someone was hired or fired. I recall one incident where Jared reported an employee to his father because he believed the employee had engaged in misconduct. The employee was fired the same day.

Marmon Decl. ¶ 4. Even if these assertions are true, the ability to influence superiors or to exert some control over daily tasks does not suffice to create supervisory authority under Vance. 133 S. Ct. at 2448 (stating that "[t]he ability to direct another employee's tasks is simply not sufficient" to create a supervisory relationship). Marmon's vague, self-serving statements cannot create a genuine issue of material fact with respect to whether Jared had the ability to take a tangible employment action against any Five Star employee, much less against Marmon. Because Jared does not qualify as Marmon's supervisor under Vance, Lilly & Sons cannot be held vicariously liable for his harassment.[6]

The court must therefore determine whether a reasonable juror could find that Five Star responded negligently to Marmon's harassment. Vance, 133 S. Ct. at 2439. When an employee is sexually harassed by a coworker, his employer can only be "liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." Hoyle v. Freightliner, LLC, 650 F.3d 321, 335 (4th Cir. 2011) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759 (1998)). However, "[t]he law against harassment is not self-enforcing, and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006) (internal quotation marks and citation omitted). When the defendant has adopted an anti-harassment policy, its distribution "provides 'compelling proof' that the [employer] exercised reasonable care in

---

[6] Likewise, Lilly & Sons cannot avail itself of the affirmative defense provided in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Ellerth, 524 U.S. 742 (1998), which applies only in the context of supervisor harassment. See, e.g., Bland v. Fairfax Cnty., Va., No. 1:10CV01030, 2011 WL 3421568, at *7 n.4 (collecting cases that demonstrate "Faragher/Ellerth is not the correct rubric with which to determine [the defendant's] liability" in coworker harassment cases).

11

preventing and correcting harassment." Hoyle, 650 F.3d at 335 (citing Barrett v. Applied Radiant Energy, 240 F.3d 262, 266 (4th Cir. 2001)). In such cases, the plaintiff "must show by a preponderance of the evidence that the policy was either adopted or administered in bad faith or that it was otherwise defective or dysfunctional." Id.

Here, the record reflects that Marmon was aware of Five Star's anti-harassment policy and how it worked. Marmon Dep. 35-41, Ex. 4 at 3, 12. It is also undisputed that, after Marmon reported Jared's harassment, Five Star conducted an investigation into his complaints and disciplined Jared as a result. Id. at 124, 126; Jared Decl. ¶ 5. The record further reflects that Jared never harassed Marmon again after Five Star's investigation began. Marmon Dep. at 124. Where "an employer's response to reported harassment is handled in accordance with the company's established policy and includes conducting an investigation and taking action to address the findings in a prompt manner, such conduct is 'reasonably calculated to end the harassment, and, therefore, reasonable as a matter of law,'" even if the harassment later reoccurs. Lorenz v. Federal Exp. Corp., 2012 WL 4459570, at *8 (citing E.E.O.C. v. Xerxes Corp., 639 F.3d 658, 671 (4th Cir. 2011)).

Marmon argues that Five Star's harassment investigation was defective for a number of reasons. First, Marmon argues that Five Star had actual or constructive knowledge of the harassment well before he complained to Wilkinson in November of 2011, because Jared had called Marmon "bob on my knob" over a number years in the presence of many Five Star employees, including Marmon's supervisors and members of the Lilly family. The court is constrained to disagree. Even assuming that individuals with authority at Five Star overheard Jared's comments, nothing in the record suggests that those individuals would have recognized those comments as anything more than "simple teasing or roughhousing among members of the same-sex," Oncale, 523 U.S. at 81-82, particularly given that Marmon repeatedly ignored Jared's comments and even left a note containing the crude phrase on his machine for a number of months. Supervisors and

company management certainly should not condone vulgarity and immaturity in the workplace; nonetheless, the court does not believe that overhearing lewd name-calling, particularly on a male-dominated shop floor where consensual male-on-male horseplay regularly occurred, would put Five Star on notice that Marmon found Jared's behavior to be unwelcome sexual harassment. See, e.g., English, 190 F.Supp.2d at 844-45.

Marmon also argues that a question of fact exists with respect to whether Five Star investigated his complaints promptly and properly. Marmon emphasizes that Wilkinson failed to investigate immediately after Marmon's initial November 19, 2010 complaint. However, both Marmon and Wilkinson testified that this delay occurred because Marmon asked Wilkinson not to pursue it. Moreover, is undisputed that Five Star began investigating Marmon's complaint no later than December 20, 2010. Marmon also complains that the investigation took longer than he would have liked. But the record shows that Five Star concluded its investigation and disciplined Jared by January 25, 2011, a little more than one month after it initiated the investigation, despite the company's disruptive holiday schedule. Marmon admits that Jared stopped saying and singing "bob on my knob" to him well before he was formally disciplined. See Marmon Dep. at 124. Five Star also promptly investigated Marmon's complaints about Shannon in January 2011, and Shannon stopped saying and singing "bob on my knob" immediately thereafter. See Marmon Dep. at 146-47. In sum, Five Star put a stop to any and all harassment directed toward Marmon in little more than two months from the time it learned of Marmon's complaint. Of course, this is not to say that Five Star's response was ideal. An employer's harassment investigation "is not required to be perfect," so long as it is "reasonable and prompt." Lorenz, 2012 WL 4459570, at *8. The court concludes that Five Star's response to Marmon's complaints satisfies this standard. As no basis exists to impute the alleged harassment to Lilly & Sons, Marmon's hostile work environment claim fails as a matter of law.

## II. Constructive Discharge:

Marmon also asserts that Five Star constructively discharged him. "A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit.'" Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985) (citing Holsey v. Armour & Co., 743 F.2d 199, 209 (4th Cir. 1984)). A plaintiff claiming constructive discharge must therefore "prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." Id. Marmon fails to do so.

The intolerability of working conditions "is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." Id. (internal citation and quotation marks omitted). Here, Marmon asserts that Jared's repeated comments and songs humiliated him, causing him to lose sleep and make mistakes at work. Although there may be a question of fact with respect to whether this harassment was "severe or pervasive," as necessary to make out a hostile work environment claim, the court questions whether it was so severe that a reasonable person would have felt compelled to resign. See Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").

Even assuming that a jury question exists with respect to the intolerability of Marmon's work conditions, his constructive discharge claim nonetheless fails because he cannot show that Five Star acted deliberately to induce him to leave. An employer acts deliberately when "the actions complained of were intended by the employer as an effort to force the employee to quit." Id. at 1255 (citation omitted). This requires "proof of the employer's specific intent to force an employee to leave," either through direct evidence or circumstantial evidence, which may include "a failure to act in the face of known intolerable conditions." Id. "A complete failure to act by the employer is

14

not required; an employer may not insulate itself entirely from liability by taking some token action in response to intolerable conditions." Amirmokri v. Balt. Gas and Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995). On the other hand, a response that is "reasonably calculated to end the intolerable working environment" negates any suggestion that the employer deliberately attempted to force an employee's resignation. Id.; see also Landgraf, 968 F.2d at 431 ("A reasonable employee would not [feel] compelled to resign immediately following the institution of measures which the district court found to be reasonably calculated to stop the harassment.") As discussed above, the court finds that Five Star acted reasonably promptly to end the harassment once it learned of it. The harassment did, in fact, end as a result of Five Star's actions. Because Marmon cannot show that Five Star acted deliberately to force him to leave his employment, the court concludes that Marmon's constructive discharge claim fails as a matter of law.

## Conclusion

For the reasons stated, the court will grant Lilly & Son's motion for summary judgment. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 10th day of July, 2015.

_____
Chief United States District Judge